## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CQ INTERNATIONAL CO., INC.,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 08cv10142-NG** |
| ) | |
| **ROCHEM INTERNATIONAL, INC.,** ) | |
| **USA,** ) | |
| **Defendant.** ) | |

**GERTNER, D.J.:**

## MEMORANDUM & ORDER
June 7, 2010

Plaintiff CQ International Co., Inc. ("CQ") and defendant Rochem International, Inc.,

USA ("Rochem") are direct competitors in the business of importing pharmaceutical ingredients

manufactured in China.  (Decl. Robyn Frisch ¶ 2, document #70; Revised Decl. Joan Chen,

document #109.)  CQ seeks damages for Rochem's alleged tortious interference with its

exclusive distribution agreement with the Chinese pharmaceutical manufacturer Huizhou

Dongjiang Pharmaceutical Co., Ltd.  The other claims raised in CQ's complaint -- for

declaratory relief, for an accounting, and for money had and received -- are derivative of its

tortious interference claim and thus cannot survive should that claim fail.

Rochem has moved for summary judgment on all of CQ's claims.  (Def.'s Mot. for

Summ. J., document #66.)  After CQ filed its opposition to Rochem's motion for summary

judgment, Rochem moved to strike CQ's statement of contested material facts, which CQ had

submitted in accordance with Local Rule 56.1.  Rochem has also requested that the Court strike

(in whole or in part) two declarations that CQ filed in support of its opposition.  (Def.'s Mot. to

Strike, document #94.)  Finally, Rochem has sought litigation sanctions under Federal Rule of

Civil Procedure 11 and 28 U.S.C. § 1927, and CQ has responded by requesting the Court to

impose sanctions on Rochem.  (Def.'s Mot. for Sanctions, document #121; Pl.'s Opp'n to Def.'s

Mot. for Sanctions 19-20, document #130.)

For the reasons described below, the Court grants Rochem's motion for summary

judgment.  It also grants its motion to strike insofar as it seeks to strike a supplemental

declaration from witness Chen Hongyi that CQ submitted on January 19, 2010.  In addition, the

Court strikes an untimely supplemental declaration from CQ's president, Joan Chen.  (It should

be noted, however, that the outcome of Rochem's summary-judgment motion would be the same

even if this Court did consider the stricken documents.)  The Court denies the remainder of

Rochem's motion to strike as moot in light of its ruling on Rochem's motion for summary

judgment.  The Court will not impose sanctions on either party.

## I.      FACTUAL BACKGROUND

Since Rochem has moved for summary judgment, the Court presents the facts in the light

most favorable to CQ as the non-moving party, drawing all reasonable inferences in its favor.

Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002).

### A.      General Information About CQ and Rochem

Before a Chinese manufacturer can export an active pharmaceutical ingredient ("API")

such as clozapine, the drug at issue in this case, to the United States, it must first obtain approval

from the Food and Drug Administration ("FDA").[1]  (See Revised Decl. Joan Chen ¶¶ 6-8.)  CQ

---

[1] An active pharmaceutical ingredient is defined as:

[A]ny substance or mixture of substances intended to be used in the manufacture of a drug product
and that, when used in the production of a drug, becomes an active ingredient in the drug product.
Such substances are intended to furnish pharmacological activity or other direct effect in the
diagnosis, cure, mitigation, treatment or prevention of disease or to affect the structure and
function of the body.

U.S. Food & Drug Administration, Compliance Program Guidance Manual, Program 7356.002F at 4,

and Rochem assist Chinese manufacturers in obtaining FDA approval and complying with U.S. regulations. After FDA approval is obtained, the companies also purchase the APIs produced by the Chinese manufacturers and then sell them to pharmaceutical companies in the United States.

Since obtaining FDA approval is a lengthy process that requires significant up-front costs, companies such as CQ and Rochem generally enter into exclusive distribution agreements with the Chinese manufacturers with which they work. (See id. ¶ 40.) Such agreements help ensure that the companies can recoup their initial investments in obtaining FDA approval for the pharmaceuticals produced by the Chinese manufacturers. Without the exclusive agreements, other importers could exploit the FDA approval that the Chinese manufacturer's original U.S. liaison had expended time, money, and energy to procure. These free riders would bid up the price of the Chinese manufacturer's pharmaceutical, decreasing the original liaison's opportunity to make a profit capable of covering its up-front costs. Mindful of this free-rider problem, a U.S. corporation would likely be hesitant to assist a Chinese manufacturer in obtaining FDA approval in the absence of an exclusivity agreement. As a result, one would expect to find exclusivity provisions in most contracts between U.S. importers and Chinese pharmaceutical manufacturers looking to break into the U.S. market. Furthermore, since such agreements help U.S. importers overcome the free-rider problem (and thus help facilitate the free flow of low-priced Chinese pharmaceuticals to U.S. consumers), they are likely desirable as a matter of public policy.

---

http://www.fda.gov/downloads/ICECI/ComplianceManuals/ComplianceProgramManual/ucm125420.pdf (adopting definition set forth in International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use, Good Manufacturing Practice Guide for Active Pharmaceutical Ingredients (Q7) 39 (2000)).

Clozapine is an active pharmaceutical ingredient used to treat schizophrenia. National Institutes of Health, What Medications Are Used To Treat Schizophrenia?, http://www.nimh.nih.gov/health/publications/mental-health-medications/what-medications-are-used-to-treat-schizophrenia.shtml (last visited May 19, 2010).

There is considerable bad blood between CQ and Rochem.  In 2002, they sparred over

Rochem's marketing of the drug paclitaxel to the U.S. company Protarga, Inc.  (Id. ¶ 3.)

According to CQ, residual animosity lingering from this dispute motivated Rochem's president,

Robyn Frisch, to engage in the tortious conduct alleged in CQ's complaint.  See G.S. Enters.,

Inc. v. Falmouth Marine, Inc., 571 N.E.2d 1363, 1369 (Mass. 1991) (setting forth the elements of

the tort of intentional interference with contractual relations, one of which is that the

"defendant's interference . . . was improper in motive or means").

**B.      CQ's Relationship with Huizhou Predecessor**

In 2000, CQ entered into an exclusive distribution agreement with Guangdong Huizhou

Dongjiang Pharmaceutical Factory ("Huizhou Predecessor").  (Def.'s Statement Undisputed

Material Facts ¶ 1 [hereinafter "DSMF"], document #68.)  In the parties' contract, CQ agreed to

"assist and help" Huizhou Predecessor in obtaining FDA approval to sell Clozapine in the U.S.

market and in complying with U.S. regulations.  (CQ-Huizhou Contract ¶ 1, Ex. 1 to 2d Am.

Compl., document #25.)  In return, Huizhou Predecessor granted CQ the exclusive right to sell

its Clozapine to buyers in the United States.  (Id. ¶¶ 1-2.)  CQ, in turn, agreed to "buy Clozapine

exclusively from [Huizhou Predecessor], not from any other Chinese or foreign manufacturer."

(Id. ¶ 2.)  The contract became effective immediately when both parties signed it in 2000 and

was to remain in effect until ten years after the FDA approved Huizhou Predecessor's Clozapine

for importation into the United States.  (Id. ¶ 7.)

**C.      The Auction of Huizhou Predecessor's Assets**

In April 2004, the Chinese government auctioned off a majority of Huizhou

Predecessor's assets.  (Revised Decl. Joan Chen ¶ 10.)  CQ participated in this auction and

thereby agreed to the terms of the "Transfer Auction Proposal," a document setting forth the ground rules for the auction.  (DSMF ¶¶ 7-8; <u>see also</u> Transfer Auction Proposal § Eleven(4) [hereinafter "TAP"], Ex. 7 to Kimberly Kefalas Decl., document #71.)  However, it did not succeed in its effort to purchase Huizhou Predecessor's assets.  Instead, the winning bidder was a Chinese man named Qiu Huazhou ("Qiu").  (DSMF ¶ 12.)  Qiu continued Huizhou Predecessor's business under the new name Huizhou Dongjiang Pharmaceutical Co., Ltd. ("Huizhou Successor").  (<u>Id.</u>; Decl. Qiu Huazhou ¶ 6, document #69.)

Rochem and CQ strenuously dispute whether CQ's contract with Huizhou Predecessor survived the auction and became binding on Huizhou Successor.  Rochem notes that the auction proposal required the auction winner to pay a deposit of 2 million yuan RMB to Huizhou Predecessor "[t]o guarantee normal distribution and operations."  (TAP § Eleven(8).)  CQ was to refund the amount of this deposit to the auction winner "upon execution . . . of a product distribution succession contract."  (<u>Id.</u>)  The parties agree that Qiu never paid a 2 million yuan RMB deposit to Huizhou Predecessor and that Huizhou Successor and CQ never executed a "product distribution succession contract."  (<u>See</u> DSMF ¶¶ 13-14; Pl.'s Local R. 56.1 Submission 2 [hereinafter "PSMF"], document #90.)   As a result, Rochem argues that the conditions of the auction proposal were not fulfilled and thus the CQ-Huizhou Contract was terminated well before Rochem arrived on the scene in 2006.

Although the issue is complicated,[2] the Court rejects Rochem's argument and agrees with CQ that its contract with Huizhou Predecessor became binding on Huizhou Successor after the auction. CQ's contract with Huizhou Predecessor explicitly provided that it would be "binding upon each party's successors." (CQ-Huizhou Contract ¶ 7.) The auction proposal also included the CQ-Huizhou Contract in the "management right" to be purchased by the auction winner. (TAP § Eleven(8).) The auction proposal stated that this contract was "still current" and required that the auction winner "continue to perform" under the contract. (Id.)

To be sure, the provisions regarding a deposit and the execution of a "succession contract" muddy the waters. However, this Court's holding that the CQ-Huizhou Contract survived the auction and became binding on Huizhou Successor is a holding most in accord with the language of the contract and auction proposal and with considerations of public policy. CQ would be seriously prejudiced if Huizhou Predecessor could free itself from the duty to deal exclusively with CQ by selling its assets to another entity after CQ had invested time and resources into helping it obtain FDA approval for its Clozapine.

**D.    CQ Signs a New Exclusive Distribution Agreement With Different Chinese Manufacturers**

CQ sold the Clozapine manufactured by Huizhou Predecessor and Huizhou Successor to Ivax Pharmaceuticals ("Ivax"), a U.S. corporation. CQ claims that sometime in 2004, Ivax requested that CQ obtain micronized Clozapine on its behalf. (Revised Joan Chen Decl. ¶ 24.)

---

[2] It is not even clear what law the Court should apply in considering the effect of the auction proposal on the CQ-Huizhou Contract. The contract itself provides that it will be governed by Massachusetts law. (CQ-Huizhou Contract ¶ 8.) However, since the auction of Huizhou Predecessor's assets occurred in China, one would assume that the auction proposal would be governed by Chinese law. Since the parties have not raised the issue, however, the Court will interpret the auction proposal in light of the general principle that "[j]ustice, common sense and the probable intention of the parties are guides to construction of a written instrument." Stop & Shop, Inc. v. Ganem, 200 N.E.2d 248, 251 (Mass. 1964).

(As the name suggests, "micronized Clozapine" is Clozapine that has been finely ground using special micronizing equipment.)  According to CQ, Huizhou Successor did not have the capacity to provide micronized Clozapine and was unwilling to invest in the necessary equipment and facilities.  (Id. ¶¶ 24-25.)  Since Huizhou Successor could not fulfill Ivax's request, CQ developed a relationship with two other Chinese pharmaceutical manufacturers, Wuhan Shiji Jingmao Corp. ("SJ") and Wuhan Yanhuang Chemical Co., Ltd. ("YH"), that it believed could provide micronized Clozapine.  (See id. ¶ 26.)  The contract that CQ, SJ, and YH signed in February 2005 provides: "CQ shall have Clozapine produced exclusively at the factories of SJ and YH; it cannot purchase Clozapine from any other Chinese or foreign manufacturers."  (CQ-SJ-YH Contract ¶ 5, Ex. 9 to Kimberly Kefalas Decl.)  However, CQ has never purchased any Clozapine from SJ and YH under this contract.  (PSMF 4.)

>        **E.**        **CQ Stops Purchasing Clozapine from Huizhou Successor and Rochem Arrives on the Scene**

CQ ordered Clozapine from Huizhou Successor for the last time in May 2005, approximately three months *after* it signed its exclusive distribution agreement with YH and SJ.  (DSMF ¶ 17.)  CQ and Huizhou Successor had little contact after CQ placed this order.  (See Pl.'s Am. & Supplemental Answers to Def.'s 1st Set of Interrogatories at Resp. 3 ("CQ states that it rarely communicated with Huizhou Successor.  In Fall 2005 through Spring 2006, Mr. Wei Fang Lin of Huizhou Successor contacted [CQ representatives] via telephone approximately five times to inquire whether CQ was planning to purchase Clozapine."), Ex. 1 to Kimberly Kefalas Decl.)

Rochem became interested in purchasing Clozapine from a Chinese manufacturer sometime in early 2006.  Rochem claims that it was approached by Mylan, a U.S.

pharmaceutical company, to obtain a price for Clozapine.  (DSMF ¶ 37.)  CQ disputes this claim

and asserts instead that Rochem decided to begin marketing Clozapine on its own initiative.

(PSMF 14.)  Regardless, it is clear that Rochem contacted Huizhou Successor around April 2006

to discuss the possibility of purchasing Clozapine from it.[3]  (See DSMF ¶ 45.)  According to

Rochem, it conducted a thorough investigation to determine whether Huizhou Successor was

bound by any exclusive distribution agreements that would prohibit it from doing business with

Rochem.  (Id. ¶¶ 40-54.)  Rochem claims that it learned during this investigation that "CQ had

not purchased Clozapine in nearly a year, that CQ owed Huizhou Successor money, and that CQ

was not answering Huizhou Successor's emails or telephone calls."  (Id. ¶ 45.)  Rochem's

President Robyn Frisch avers that Qiu Huazhou, Huizhou Successor's owner, personally told her

that "Huizhou Successor was free to do business with Rochem."  (Robyn Frisch Decl. ¶ 9,

document #70.)  Rochem also alleges that during its investigation, Ivax informed Rochem that

CQ had told Ivax that "Huizhou Successor would no longer be a viable source of Clozapine and

that [its] factory was shutting down."  (DSMF ¶ 51.)  Based on this information, Rochem claims

that it concluded that "Huizhou Successor did not have a contractual relationship with CQ or

anyone else."  (Id. ¶ 53.)

　　　　Naturally, CQ contests both the thoroughness of Rochem's investigation and its

conclusion that it could permissibly do business with Huizhou Successor.  CQ sets forth the

following timeline of Rochem's interactions with Huizhou Successor:

---

[3] CQ notes that Rochem contacted another Chinese Clozapine manufacturer, Shanghai No. 15, but decided
not to pursue a sale with it after it learned that Shanghai No. 15 had an exclusive distribution agreement with another
company.  (PSMF 7.)  CQ offers this fact as evidence that Rochem was animated by an "improper motive" when it
purchased Clozapine from Huizhou Successor despite its knowledge of the CQ-Huizhou Contract.  According to
CQ, the fact that Rochem backed away from a deal with Shanghai No. 15 but not with Huizhou Successor
demonstrates that it was motivated by ill will toward CQ.

- **April 24, 2006:** Rochem met with employees of Huizhou Successor at a hotel in Shenzhen City.  (Robyn Frisch Dep. 63:11-22, Aug. 19, 2009, Ex. 5 to Kimberly Kefalas Decl.)  Huizhou Successor's employees gave Rochem a copy of the CQ-Huizhou Contract at the meeting.  (Id. at 74-75.)

- **April 28, 2006:** Matthew Thiel, Rochem's Vice President of Sales, sent an email to Dennis Berry, Rochem's Vice President of Pharmaceutical Business Development, and Rochem's President Robyn Frisch that stated: "We have to be careful on IVAX but the current relationship between CQ and the MFGR [i.e., Huizhou Successor] is more than strained and we could stand to benefit from this but short term I wouldn't want CQ catching any wind of this activity of ours."  (E-mail from Matthew Thiel, Vice President of Sales, Rochem, to Dennis Berry, Vice President of Pharmaceutical Business Development, Rochem, & Robyn Frisch, President, Rochem (April 28, 2006), Ex. 10 to Revised Decl. Herbert Cohen, document #110.)

- **April 29-May 2, 2006:** Rochem prepared a "change of agent" letter that would allow Rochem to communicate with the FDA on Huizhou Successor's behalf.  Rochem then forwarded this letter to Huizhou Successor for it to sign.  (See PSMF 6.)

- **May 9, 2006:** Several days after Rochem sent the change of agent letter to Huizhou Successor, Rochem's President Robyn Frisch spoke with Huizhou Successor's President Qiu Huazhou.  (PSMF 14-15.)

- **May 10, 2006:** A Rochem employee sent Huizhou Successor a fax accusing CQ of "defaming" Huizhou Successor by stating that Huizhou Successor "ha[d] stopped production of Clozapine owing to various internal problems and no longer ha[d] the capacity to adequately supply the market."  (Fax from Chen Lei, Sourcing Manager, Rochem, to Qiu Huazhou, President, Huizhou Successor (May 10, 2006), Ex. 11 to Revised Herbert Cohen Decl.)

CQ also claims that Rochem did not learn of CQ's contract with SJ and YH until 2007, long after Rochem had placed its orders for Clozapine from Huizhou Successor.  (PSMF 6.) Thus, CQ argues that Rochem could not have relied on this contract in reaching its conclusion that it could permissibly do business with Huizhou Successor.

Although Rochem and Huizhou Successor could not agree on the terms of an exclusive distribution agreement, (DSMF ¶ 56), Rochem purchased Clozapine from Huizhou Successor on three occasions in 2006, (id. ¶ 59).  The last of these purchases was made on August 22, 2006.

(<u>Id.</u> ¶ 63.)  Rochem sold the Clozapine that it purchased from Huizhou Successor to CQ's former customer, Ivax.  (<u>Id.</u> ¶ 59.)  It made its last sale to Ivax on December 4, 2006.  (<u>Id.</u> ¶ 61.)

## II.   PROCEDURAL HISTORY

Rochem's motion to strike and the parties' competing requests for litigation sanctions require a fairly detailed review of this case's procedural history.  CQ filed its initial complaint on January 30, 2008.  (Compl., document #1.)  Rochem moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) on March 27, 2008.  (Def.'s Mot. to Dismiss, document #4.)  CQ moved to extend the deadline for it to respond to Rochem's motion.  (Pl.'s Mot. for Extension of Time, document #6.)  The Court granted CQ's motion and set a new response deadline of May 10, 2008.  (Electronic Order, Apr. 21, 2008.)  On May 14, 2008, four days after the extended deadline, CQ filed a motion for leave to file an amended complaint.  (Pl.'s Mot. for Leave to File Substituted Compl., document #9.)  CQ submitted this motion in lieu of filing an opposition to Rochem's motion to dismiss.  Since Rochem did not oppose CQ's request to file an amended complaint, the Court granted the request on June 2, 2008.  (Def.'s Resp. to Pl.'s Mot. for Leave to File Substituted Compl., document #11; Electronic Order, June 2, 2008.)

Rochem then moved to dismiss CQ's amended complaint on June 27, 2008.  (Def.'s Mot. to Dismiss Substituted Compl., document #14.)  On July 25, 2008, CQ sought an extension of time to respond to Rochem's motion.  (Pl.'s Mot. to Enlarge Time, document #17.)  Although CQ filed this motion well after its opposition to Rochem's motion to dismiss was due, <u>see</u> Local R. 7.1(b)(2) (setting forth the general rule that an opposition to a motion must be filed within fourteen days of service of the motion), the Court granted CQ's request.  (Electronic Order, Aug. 4, 2008.)  After CQ filed its opposition on August 5, 2008, the Court denied Rochem's motion to

dismiss, concluding that CQ "ha[d] alleged sufficient facts to state a claim for intentional

interference with performance of contract." (Electronic Order, Oct. 9, 2008.) The Court also

granted CQ leave to file a second amended complaint to correct typographical errors in its

amended complaint. Id.

CQ served Rochem with the initial disclosures required by Federal Rule of Civil

Procedure 26(a)(1) in November 2008, four months after the July 7, 2008 deadline agreed to by

the parties. (Joint Scheduling Conference Statement 2, document #12; Def.'s Mem. of Law in

Supp. of Mot. to Compel & for Disc. Sanctions 4, document #52.) Rochem served its initial

disclosures in a timely manner. (Id.)

Although discovery in this case was originally to have been completed by March 31,

2009, the Court was compelled to extend this deadline on three occasions -- first to May 31,

2009, then to August 30, 2009, and finally to September 18, 2009. The discovery process grew

contentious, eventually requiring the Court's intervention. On June 16, 2009, this Court granted

a motion to compel CQ to make a representative available for a deposition in accordance with

Federal Rule of Civil Procedure 30(b)(6). The Court's order noted that CQ "ha[d] not acted in

good faith to arrange a timely and mutually convenient date" for the deposition. (Electronic

Order, June 16, 2009.) Then, on August 16, 2009, the Court granted Rochem's motion for a

protective order, limiting the scope of an overly broad deposition notice served by CQ.

(Protective Order, Aug. 16, 2009, document #50.)

Next, Rochem filed a motion to compel and for discovery sanctions on August 25, 2009.

(Def.'s Mot. to Compel & for Disc. Sanctions, document #51.) Among other things, Rochem's

motion requested that the Court preclude CQ from relying on any testimony that might be

provided by "Hogg Chen," CQ's agent in China who facilitated its Clozapine purchases from the

Huizhou companies.  Rochem objected to the fact that CQ first named this key witness in

amended initial disclosures served on August 6, 2009, more than a year after the original initial-

disclosures deadline.[4]  (Def.'s Mem. of Law in Supp. of Mot. to Compel & for Disc. Sanctions 5-

6.)  Although the Court granted Rochem's motion to compel on September 17, 2009, it reserved

the issue of discovery sanctions.  (See Electronic Clerk's Notes, Oct. 8, 2009 ("Mtn for

Sanctions . . . under advisement.").)

        After discovery ended on September 18, 2009, the case took a turn from the highly

litigious to the surreal.  In an effort to foster settlement discussions, the Court ordered CQ to

make a written offer of settlement by October 16, 2009.  Although CQ complied, it demanded

$675,000, the full amount of the damages claimed in its amended initial disclosures.  Rochem

took umbrage at CQ's offer, believing that it was not made in good faith since it did not reflect

any discount from the full value of CQ's jury demand.  Rochem replied by demanding that CQ

*pay it* money to settle the action in order to avoid a motion for Rule 11 sanctions and a suit for

malicious prosecution.  The amount of money that Rochem demanded from CQ was peculiar --

$444,444.44.  (Letter from Kimberly Kefalas, Attorney for Rochem, to Herbert Stuart Cohen,

Attorney for CQ (Oct. 23, 2009), Ex. B to Kimberly Kefalas Decl. in Supp. of Def.'s Mot. for

Sanctions, document #123.)  Apparently, four is considered an unlucky number in China because

it is nearly homophonous with the Chinese word for death.  See It's a Fact; Superstitions, Sunday

Mail (Glasgow, Scotland), Feb. 24, 2008, at Features 3; see also Ex. J to Herbert Cohen Decl. in

---

[4] Although CQ did not formally disclose Hogg Chen in accordance with Federal Rule of Civil Procedure
26(a)(1)(A) until August 6, Joan Chen -- CQ's President -- mentioned that Hogg Chen worked as an advisor for CQ
in her July 17, 2009 deposition.  (Joan Chen Dep. 35-38, 98, July 17, 2009, Ex. 3 to Kimberly Kefalas Decl.)

Opp'n to Def.'s Mot. for Sanctions (document #131).  CQ brought this letter to the Court's attention on November 18, 2009, (Letter from Herbert Cohen, Attorney for CQ (Oct. 23, 2009), document #93), and the Court held a brief telephone conference regarding the letter on December 16, 2009.  While the Court hardly considers Rochem's "counter-offer" a threat -- much less a death threat, as CQ's November 18 letter might be read as implying -- it nonetheless believes that Rochem's attorneys acted wholly improperly in sending the letter to CQ's counsel. Although the Court has no desire to officiate parties' settlement negotiations, it wants to make clear that it does not condone such conduct.  If Rochem's attorneys believed that CQ was not negotiating in good faith, there were much better ways for them to handle the matter than to respond with a flippant letter sure to antagonize the opposing party.

Rochem filed its motion for summary judgment on October 14, 2009.  (Def.'s Mot. for Summ. J., document #66.)  It later moved to strike two declarations CQ had submitted in support of its opposition to Rochem's motion and CQ's statement of contested material facts.  (Def.'s Mot. to Strike, document #94.)  Rochem also moved for litigation sanctions under Rule 11 and 28 U.S.C. § 1927, and CQ responded by requesting that the Court instead sanction Rochem. (Def.'s Mot. for Sanctions, document #121; Pl.'s Opp'n to Def.'s Mot. for Sanctions 19-20, document #130.)

The Court requested supplemental briefing regarding Rochem's motion for summary judgment on January 13, 2010.  (Order re Hearing, Jan. 13, 2010, document #114.)  Both parties filed supplemental memoranda of law, and CQ accompanied its memorandum with additional declarations.  One of these supplemental declarations contained new, highly material testimony from Chen Hongyi, who CQ represents is the same person as Hogg Chen, the Chinese advisor it

named in its August 6, 2009, amended initial disclosures.  (Supplemental Decl. Chen Hongyi,

document #118.)  CQ filed Hongyi's supplemental declaration at approximately 5:00 p.m. on

January 19, 2010 -- the day before the summary-judgment hearing in this case and more than two

months after CQ submitted its initial opposition to Rochem's summary-judgment motion.  At the

summary-judgment hearing, the Court granted the parties leave to file further briefing addressing

whether it should consider Hongyi's late-filed declaration.

## III.    LEGAL ANALYSIS

### A.       Standard for Granting a Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56(c), a motion for summary judgment should be

granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment

as a matter of law."  Although the "party moving for summary judgment bears the initial burden

of demonstrating that there are no genuine issues of material fact for trial," this burden "may be

discharged by . . . pointing out to the district court . . . that there is an absence of evidence to

support the nonmoving party's case."  Rochester Ford Sales, 287 F.3d at 38 (quoting Celotex

Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  "After such a showing, the 'burden shifts to the

nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate

that a trier of fact reasonably could find in his favor.'"  Id. (quoting DeNovellis v. Shalala, 124

F.3d 298, 306 (1st Cir. 1997)).  Ultimately, "after examining the facts in the light most favorable

to the nonmoving party and drawing all reasonable inferences in its favor," the Court must

determine whether "there is sufficient evidence favoring the nonmoving party for a jury to return

a verdict for that party."  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249

(1986)).  If such evidence exists, the motion for summary judgment should be denied.

Otherwise, it should be granted.

**B.      Rochem is entitled to summary judgment because CQ breached its contract with Huizhou Successor before Rochem made its purchases and because CQ cannot prove that it was harmed by Rochem's conduct.**

Since CQ is a Massachusetts corporation based in Massachusetts and Rochem is a New York corporation with its primary place of business in New York, (Pl.'s 2d Am. Compl. ¶¶ 1-2), either Massachusetts or New York law could potentially apply to CQ's claims.  Although Rochem provides a brief choice-of-law analysis in its memorandum in support of its motion for summary judgment, (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. 6-7, document #67), it is clear from the parties' subsequent filings that they are content to have the Court apply Massachusetts law to their dispute.  Also, to the extent that CQ's claims require the Court to interpret the CQ-Huizhou Contract and the CQ-SJ-YH Contract, both contracts explicitly provide that their terms are to be governed by Massachusetts law.  (CQ-Huizhou Contract ¶ 8; CQ-SJ-YH Contract ¶ 11.)

In Massachusetts, for a plaintiff to prevail on a claim of intentional interference with contractual relations, he must prove that "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."  G.S. Enters., 571 N.E.2d at 1369.  CQ bears the burden of proving all of these elements.  Thus, if the Court decides that a reasonable jury could not find for CQ on any one of these elements, it should grant summary judgment to Rochem.

The Court will focus on the following questions: (1) whether CQ breached its contract with Huizhou Successor before Rochem made its purchases, and (2) whether CQ was harmed by Rochem's conduct.  Since the Court finds in Rochem's favor on both of these questions, it will not reach the issue of whether, assuming that CQ was not already in breach of its contract with Huizhou Successor, Rochem intentionally and improperly induced Huizhou Successor to break the contract.

For the reasons discussed above, the Court concludes that CQ's contract with Huizhou Predecessor survived the auction of Huizhou Predecessor's assets and became binding on Huizhou Successor.  However, Huizhou Successor was discharged from its duty to perform under its contract with CQ -- and thus was free to sell Clozapine to Rochem -- by CQ's signing of its separate agreement with SJ and YH.

Although CQ's contract with Huizhou Successor was a mixed contract for both goods (Clozapine) and services (assistance with obtaining FDA approval and complying with U.S. laws), the parties agree that Massachusetts's version of Article 2 of the Uniform Commercial Code ("U.C.C."), which applies only to "transactions in goods," governs the contract.  See Mass. Gen. Laws ch. 106, § 2-102; USM Corp. v. Arthur D. Little Sys., Inc., 546 N.E.2d 888, 894 (Mass. App. Ct. 1989) (noting that Article 2 applies when the sale of goods constitutes a significant part of the agreement and the provision of services is incidental); see also Specialty Beverages, L.L.C. v. Pabst Brewing Co., 537 F.3d 1165, 1174 (10th Cir. 2008) (noting that the majority of courts that have addressed the issue have concluded that "Article 2 governs distribution agreements because the sale of goods is the predominant factor").  Under the U.C.C., CQ's agreement to serve as the exclusive distributor of Huizhou Successor's Clozapine carried

with it an implied obligation to use its best efforts to promote the sale of Huizhou Successor's product.  <u>See</u> Mass. Gen. Laws ch. 106, § 2-306(2).  This rule codifies the common-law principle that a party who contracts to serve as another's exclusive agent implicitly promises to make reasonably strenuous efforts to further the principal's interests.  <u>See</u> <u>Wood v. Lucy, Lady Duff-Gordon</u>, 118 N.E. 214, 214-15 (N.Y. 1917); <u>see also</u> <u>Sonoran Scanners, Inc. v. Perkinelmer, Inc.</u>, 585 F.3d 535, 542-44 (1st Cir. 2009); <u>Eno Sys., Inc. v. Eno</u>, 41 N.E.2d 17, 19-20 (Mass. 1942).

CQ's argument that it did not breach its contract with Huizhou Successor because it never actually purchased Clozapine from SJ and YH is thus meritless.  True, the contract merely required CQ to *buy* Clozapine exclusively from Huizhou Successor and did not expressly bar CQ from *marketing* other Chinese manufacturers' Clozapine to U.S. companies.  However, CQ had an implied obligation to make reasonable efforts to ensure that it would have a demand for Huizhou Successor's Clozapine.  In other words, CQ was obligated to make conscientious efforts to market Huizhou Successor's Clozapine to potential buyers in the United States so that CQ, in turn, would have reason to purchase Clozapine from Huizhou Successor to resell to those U.S. buyers.  CQ's agreement to purchase Clozapine exclusively from SJ and YH was inconsistent with this obligation.  CQ could not simultaneously fulfill its promise to SJ and YH not to purchase Clozapine from Huizhou Successor (or any other foreign manufacturer) and its implied promise to Huizhou Successor to make reasonable efforts to create a demand for its Clozapine.  CQ simply could not generate a demand for a product that it was contractually obligated not to

purchase.  By signing its exclusive distribution agreement with SJ and YH, CQ thus breached its

contract with Huizhou Successor.[5]

This breach was material.[6]  CQ's explicit promise to purchase Clozapine from no other

foreign manufacturer than Huizhou Successor, and its attendant implicit promise to make

reasonable efforts to generate a demand for Huizhou Successor's Clozapine, were "essential and

inducing feature[s]" of Huizhou Successor's contract with CQ.  Buchholz v. Green Bros. Co.,

172 N.E. 101, 102 (Mass. 1930).  Huizhou Successor undoubtedly would not have agreed to sell

its Clozapine into the United States market exclusively through CQ unless CQ also agreed to

deal exclusively with Huizhou Successor and not any other foreign manufacturer of Clozapine.

CQ's obligation not to enter into a distribution agreement with another Chinese manufacturer of

Clozapine thus "went to the root" of its contract with Huizhou Successor.  Id.  CQ's breach of

---

[5] In addition to being supported by Mass. Gen. Laws ch. 106, § 2-306 and the common-law cases on exclusive agency relationships, this conclusion also follows from the obligation of good faith that inheres in every contractual relationship.  Eigerman v. Putnam Invs., Inc., 877 N.E.2d 1258, 1264 (Mass. 2007); see also Mass. Gen. Laws ch. 106, § 1-203.  Indeed, section 2-306 and the principle articulated in cases such as Wood v. Lucy, Lady Duff-Gordon are perhaps best viewed as particular applications of the general requirement of good faith.  See Tory A. Weigand, The Duty of Good Faith and Fair Dealing in Commercial Contracts in Massachusetts, 88 Mass. L. Rev. 174, 175-76 (2004) (identifying Wood as the "most famous 'implied promise' case").  Since CQ qualifies as a merchant of Clozapine, see Mass. Gen. Laws ch. 106, § 2-104, its duty of good faith included both "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade," Mass. Gen. Laws ch. 106, § 2-103(1)(b).  Huizhou Successor no doubt expected that CQ would make reasonable efforts to generate a demand for its Clozapine by marketing the Clozapine to potential United States customers.  This expectation was reasonable, and CQ's signing of an inconsistent exclusive distribution agreement with SJ and YH violated it.  Thus, CQ breached the obligation of good faith and fair dealing implicit in its contract with Huizhou Successor.  See Eigerman, 877 N.E.2d at 1264 ("A breach [of the implied covenant of good faith and fair dealing] occurs when one party violates the reasonable expectations of the other.").  Massachusetts treats a violation of the implied covenant of good faith and fair dealing as a breach of the contract to which the implicit obligation applies.  See Starr v. Fordham, 648 N.E.2d 1261, 1271 (Mass. 1995); Fortune v. Nat'l Cash Register Co., 364 N.E.2d 1251, 1255-56 (Mass. 1977); Weigand, supra, at 192.

[6] Although the materiality of a contractual breach is a question of fact, it -- like any other factual question -- can be resolved on summary judgment if the issue "admits of only one reasonable answer" because "the evidence on the point is either undisputed or sufficiently lopsided."  Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 11 (1st Cir. 2006) (quoting Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir. 1994)).  Since there is no genuine issue of material fact regarding the materiality of CQ's obligation to deal exclusively with Huizhou Successor, the Court is not required to leave this issue to a jury to decide.

this material obligation discharged Huizhou Successor from its obligation to sell Clozapine exclusively to CQ.[7] See Mass. Gen. Laws ch. 106, § 2-703(f) (providing that a seller may cancel a contract for the sale of goods upon breach by the buyer); see also Restatement (Second) of Contracts § 237 & cmt. a.

Since Huizhou Successor sold Clozapine to Rochem after CQ signed its agreement with SJ and YH, the sales did not constitute a breach of Huizhou Successor's contract with CQ. As a result, Rochem did not tortiously interfere with Huizhou Successor's performance of its contractual obligations to CQ because Huizhou Successor had been discharged from those obligations well before Rochem arrived on the scene. The fact that Huizhou Successor and Rochem may have been unaware of CQ's contract with SJ and YH does not change the analysis. Even if a party to a contract is ignorant of the other party's breach, the non-breaching party may still be discharged from its obligation to perform. See Restatement (Second) of Contracts § 237 cmt. c. Here, CQ's performance of its implied contractual obligation to make its best efforts to generate a demand for Huizhou Successor's Clozapine was a condition on which Huizhou Successor's duty to deal exclusively with CQ in the marketing and selling of its Clozapine depended. This condition having failed, Huizhou Successor was discharged from its obligation to perform under the contract. Id.; see also id. § 225 (dealing with the effects of the non-occurrence of a condition).

---

[7] Although the CQ-Huizhou Contract states that "it cannot be cancelled without both parties' written consent," (CQ-Huizhou Contract ¶ 7), this provision did not nullify Huizhou Successor's right to cancel its contract with CQ following CQ's material breach. While Mass. Gen. Laws ch. 106, § 2-209(2) provides that "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded," the commentary following this section clarifies that it does not limit a party's right to put an end to a contract breached by another party. See Mass. Gen. Laws ch. 106, § 2-209 U.C.C. cmt. 3 ("Subsection[] (2) . . . . does not include unilateral 'termination' or 'cancellation' as defined in Section 2-106."); see also id. § 2-106(3)-(4) (defining the terms "termination" and "cancellation").

CQ attempts to escape this conclusion by arguing that the CQ-Huizhou Contract and the CQ-SJ-YH Contract, although facially inconsistent, were intended to deal with different products.  Although both contracts refer generally to "Clozapine," CQ contends that its contract with the Huizhou companies only covered non-micronized Clozapine and its contract with SJ and YH dealt with only micronized Clozapine.  Thus, its contract with SJ and YH did not interfere with its performance of its obligations under its contract with Huizhou Successor.

Although CQ's argument raises interesting questions regarding the weight that a court should afford to extrinsic evidence when interpreting a contractual term that appears unambiguous on its face, its efforts to develop the argument were both untimely and inadequate. Rochem clearly argued in its original memorandum of law in support of its motion for summary judgment that CQ abandoned its purported contract with Huizhou Successor by entering into its exclusive distribution agreement with SJ and YH.  (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. 8-9.)  Although CQ's memorandum in opposition responded to this argument by contending that its contract with SJ and YH was only for micronized Clozapine, a product that Huizhou Successor could not manufacture, it did not provide substantial support for its position in the form of declarations or other record evidence until the eve of the Court's summary-judgment hearing.  Then, at approximately 5:00 p.m. on the day before the hearing, CQ filed two supplemental declarations -- one from CQ's president, Joan Chen, and the other from CQ's agent in China, Chen Hongyi -- that attempted to substantiate its claim that the CQ-Huizhou Contract solely contemplated the distribution of non-micronized Clozapine and the CQ-SJ-YH Contract was exclusively for the distribution of micronized Clozapine.  (Supplemental Decl. Chen Hongyi, document #118; Supplemental Decl. Joan Chen, document #120.)

Joan Chen's supplemental declaration provides a more elaborate account of CQ's rationale for entering into a separate contract with SJ and YH.  Chen's original declaration stated that Ivax approached CQ with a request for micronized Clozapine in approximately 2004. (Revised Chen Decl. ¶ 24.)  It further declared that "CQ was informed and knew" that Huizhou Successor could not micronize its Clozapine because it lacked the proper equipment and facilities and did not have the financial wherewithal to make the investments necessary to gain a micronizing capacity.  (Id. ¶¶ 24-25.)  CQ thus formed a relationship with SJ and YH because they were "willing to invest in producing micronized Clozapine."  (Id. ¶ 26.)  Chen's original declaration also emphasized that CQ last purchased Clozapine from Huizhou Successor in May 2005, approximately three months after it signed its contract with SJ and YH, and that it never bought Clozapine from SJ and YH.  (Id. ¶¶ 29-30.)

Chen's supplemental declaration expands on this account.  It states:

> It was always the intent of [CQ, SJ, and YH] that the scope of the[ir] contract concerned only the sale of micronized Clozapine and not nonmicronized Clozapine as CQ had a previous contract with Huizhou Successor and was required to purchase nonmicronized Clozapine from Huizhou Successor.
>
> It was the parties['] understanding that in entering the February 2005 contract with [SJ] and [YH] that CQ would continue to purchase Clozapine (nonmicronized) from Huizhou Successor.
>
> . . . .
>
> Chen Hongyi, President of [SJ], . . . facilitated CQ's May 2005 purchase of Huizhou Successor's Clozapine.
>
> Moreover, . . . Huang Xuan, President of [YH,] knew that CQ was arranging to purchase nonmicronized Clozapine from Huizhou Successor in May 2005 and Huang Xuan never opposed or objected to CQ's said purchase from Huizhou Successor as same was not in violation of the [CQ-SJ-YH] Contract.  Huang Xuan

always understood that the underlying basis and intent . . . of the [CQ-SJ-YH] Contract was [that] CQ would continue purchasing nonmicronized Clozapine from Huizhou Successor.

(Supplemental Decl. Joan Chen ¶¶ 10-15 (paragraph numbering omitted).)

While Joan Chen's original declaration at least mentioned CQ's contract with SJ and YH, Chen Hongyi's original declaration does not discuss the relationship at all. Instead, it focuses on the actions Hongyi took as an advisor to CQ in its interactions with the Huizhou companies. (Decl. Chen Hongyi, document #106.)  In his supplemental declaration, however, Hongyi discloses that, in addition to being CQ's advisor, he is also the president of SJ.  (Supplemental Decl. Chen Hongyi ¶ 3.)  He represents that "[SJ's] intent in entering the [CQ-SJ-YH] Contract was to create a distribution agreement . . . for micronized Clozapine."  (Id. ¶ 5.)  He also states that it was his understanding that the CQ-SJ-YH Contract did not bar CQ from purchasing non-micronized Clozapine from Huizhou Successor.  (Id. ¶ 7.)  In fact, he "acted as CQ's advisor and facilitated" CQ's final purchase of non-micronized Clozapine from Huizhou Successor in May 2005, three months after the company he represented entered into its exclusive distribution agreement with CQ.  (Id. ¶ 8.)  Naturally, Hongyi states that he "would not have assisted with [this purchase] if [he] had thought that [it] would violate the [CQ-SJ-YH] Contract."  (Id. ¶ 9.)

Although Chen and Hongyi's supplemental declarations provide new, material information in support of CQ's claims, the Court concludes that it should not consider them because they were filed far, far too late.  CQ was obligated to include all of the sworn declarations on which it intended to rely in opposing Rochem's motion for summary judgment with the original opposition that it filed on November 10, 2009.  See Fed. R. Civ. P. 56(e)(2) (requiring a party opposing a motion for summary judgment to show, by affidavits or with other

evidence, that a genuine issue exists for trial); Local R. 7.1(b)(2) ("Affidavits and other documents setting forth or evidencing facts on which the opposition is based shall be filed with the opposition.").  This obligation applied with particular force to declarations regarding its contract with SJ and YH, which clearly was a central issue in this case.  If for some reason it could not obtain the supplemental declarations by the deadline for it to oppose Rochem's motion, CQ should have brought this issue to the Court's attention in an affidavit submitted under Federal Rule of Civil Procedure 56(f).  The Court then could have entered an order granting CQ additional time to file its declarations.  CQ, however, did not take this path.  Instead, it submitted the declarations only after the Court requested additional briefing on the legal implications of CQ's contract with SJ and YH.  (Order re Hearing, Jan. 13, 2010.)  The Court's solicitation of additional legal memoranda was not an invitation for the submission of supplemental declarations expanding on the facts in the summary-judgment record.  See Local R. 7.1(b)(3) (requiring that parties obtain leave of court before filing all papers other than motions, oppositions, and supporting documents filed contemporaneously with motions and oppositions).  CQ's belated filing of its supplemental declarations demonstrates a "lack of diligence" that the Court does not countenance.  Hebert v. Wicklund, 744 F.2d 218, 222 (1st Cir. 1984) (affirming district court's decision not to consider a late-filed affidavit in ruling on a motion for summary judgment).  The Court will thus strike the untimely supplemental declarations of Joan Chen and Chen Hongyi.

Chen Hongyi's supplemental declaration should be stricken for an additional reason:  He was not adequately disclosed to Rochem before the filing of its motion for summary judgment.  Under Federal Rule of Civil Procedure 26(a)(1)(A)(I), CQ was required at the outset of this

litigation to provide Rochem with "the name and, if known, the address and telephone number of each individual likely to have discoverable information -- along with the subjects of that information -- that [it might] use to support its claims."  CQ was also obligated to supplement its initial disclosures in a timely manner if it learned "that in some material respect the disclosure[s] . . . [were] incomplete or incorrect."  Fed. R. Civ. P. 26(e)(1)(A).

CQ did not abide by these obligations with respect to Chen Hongyi.  Chen Hongyi was not named in CQ's initial disclosures.  (Pl.'s Initial Disclosures, Ex. C to Mem. of Law in Supp. of Mot. to Compel & for Discovery Sanctions.)  His name also does not appear in CQ's amended initial disclosures, which it served on Rochem on August 6, 2009, just weeks before the end of discovery.  (Pl.'s Am. Initial Disclosures, Ex. A to Mem. of Law in Supp. of Mot. to Compel & for Discovery Sanctions.)  CQ, however, states that Chen Hongyi's nickname is Hogg Chen, and Hogg Chen's name is included in CQ's amended initial disclosures.  (Id. at 2.)  CQ's counsel represents that he did not learn that Hogg Chen is Chen Hongyi's nickname until he began preparing CQ's response to Rochem's motion for summary judgment.  (Pl.'s Opp'n to Def.'s Mot. to Strike 2, document #102.)  CQ also notes that Hogg Chen was mentioned at Joan Chen's July 17, 2009 deposition.  At the deposition, Joan Chen testified that Hogg Chen was CQ's advisor in China.  (Joan Chen Dep. 35-38, July 17, 2009, Ex. 3 to Kimberly Kefalas Decl.)  She also testified that Hogg Chen was a minority owner of SJ.  (Id. at 98:9-14.)  Finally, Rochem knew well before it filed its motion for summary judgment that a man named Chen Hongyi signed the CQ-SJ-YH Contract on behalf of SJ.  (See CQ-SJ-YH Contract (containing the words "Chen Hongyi" and "President" in SJ's signature block).)

In retrospect, perhaps Rochem could have pieced these clues together and surmised that Chen Hongyi and Hogg Chen are the same person and that Chen Hongyi both serves as CQ's advisor and is the president of SJ.  From these facts, Rochem could have deduced that Hongyi would have information about CQ's interactions with both the Huizhou companies and SJ. However, Rochem did not bear the obligation of making these connections, especially when they were not made by CQ's counsel himself.  CQ's late disclosure of "Hogg Chen" in the summer of 2009, just before the end of discovery, was woefully inadequate.  Since Chen Hongyi played a pivotal role in facilitating CQ's purchases of Clozapine from the Huizhou companies, he should have been disclosed to Rochem at the outset of this litigation.

The Court is also troubled by the fact that before CQ submitted its supplemental declarations in January 2010, it appears not to have formally disclosed that Chen Hongyi (1) believed that the CQ-SJ-YH contract was intended only to apply to micronized Clozapine, and (2) was personally involved in CQ's May 2005 purchase of non-micronized Clozapine from Huizhou Successor.  CQ's amended initial disclosures merely list Hogg Chen as an individual with discoverable information regarding CQ's interactions with the Huizhou companies and Ivax and do not reveal that he possesses information regarding SJ.  (Pl.'s Am. Initial Disclosures 2, Ex. A to Mem. of Law in Supp. of Mot. to Compel & for Discovery Sanctions.)  Well before January 2010, CQ should have amended its initial disclosures to clarify that (1) Hogg Chen is the same person as Chen Hongyi; (2) Chen Hongyi served as CQ's advisor in arranging purchases of Clozapine from Huizhou Successor; and (3) as president of SJ, Chen Hongyi was intimately familiar with the CQ-SJ-YH Contract.  See Fed. R. Civ. P. 26(a)(1)(A) Advisory Committee Notes to 1993 Amendments ("Indicating briefly the general topics on which [persons disclosed

in accordance with Rule 26(a)(1)(A)] have information should not be burdensome, and will

assist other parties in deciding which depositions will actually be needed.").

Generally, a party who fails to disclose a witness when required by Rules 26(a)(1)(A)

and (e)(1) is barred from using that witness "to supply evidence on a motion, at a hearing, or at

trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); see

also Samos Imex Corp. v. Nextel Commc'ns, Inc., 194 F.3d 301, 305 (1st Cir. 1999)

("[E]xclusion of evidence is a standard sanction for a violation of the duty of disclosure under

Rule 26(a).").  Since it is the party facing sanctions, CQ bears the burden of showing that its

failure to make timely disclosures regarding Chen Hongyi was either substantially justified or

harmless.  Wilson v. Bradlees of New Eng., Inc., 250 F.3d 10, 21 (1st Cir. 2001).

CQ's untimely and incomplete disclosures were not substantially justified.  "A

substantial justification is one that 'could satisfy a reasonable person.'"  AVX Corp. v. Cabot

Corp., 252 F.R.D. 70, 78 (D. Mass. 2008) (quoting Pan Am. Grain Mfg. Co., Inc. v. P.R. Ports

Auth., 295 F.3d 108, 117 (1st Cir. 2002)).  Here, a reasonable person would have recognized that

Chen Hongyi, as CQ's advisor in dealing with Huizhou Successor, was a central figure in this

litigation and would have expected CQ to disclose him at the outset.  A reasonable person would

also have expected CQ to fully disclose Chen Hongyi's role in negotiating and executing the

CQ-SJ-YH Contract well before January 2010.  Thus, CQ's belated and incomplete disclosure of

"Hogg Chen" as an individual with information about CQ's interactions with the Huizhou

companies and Ivax was not substantially justified.

CQ's breach of its disclosure obligation also was not harmless.  As the First Circuit has

recognized, the Advisory Committee notes to the 1993 amendments to Rule 37(c)(1) "suggest a

fairly limited concept of 'harmless.'"  Gagnon v. Teledyne Princeton, Inc., 437 F.3d 188, 197

(1st Cir. 2006).  CQ's inadequate disclosures regarding Chen Hongyi do not qualify for this

narrow escape valve.  By disclosing "Hogg Chen" late in the discovery period and in a manner

that did not highlight the full breadth of his knowledge, CQ deprived Rochem of an opportunity

to depose him before filing its motion for summary judgment.  Rochem thus was not able to

probe the information that Chen Hongyi provides in his supplemental declaration and prepare to

counter it in its dispositive motion.

Although Rule 37(c)(1) permits courts to impose sanctions other than the exclusion of an

improperly disclosed witness's testimony, see AVX Corp., 252 F.R.D. at 79-80, the Court sees

no reason to deviate from the standard sanction of preclusion in this case.  The Court will thus

strike the supplemental declaration of Chen Hongyi under Rule 37(c)(1).  Although the Court

could also strike Chen Hongyi's original declaration, it sees no reason to do so since the

declaration is immaterial to its disposition of the case.

Without the supplemental declarations of Joan Chen and Chen Hongyi, CQ is left with

little record evidence to support its claim that the term "Clozapine" meant "non-micronized

Clozapine" in the contract between CQ and the Huizhou companies and "micronized Clozapine"

in the CQ-SJ-YH Contract.  Massachusetts's codification of the U.C.C. permits this Court to

consider extrinsic evidence of the parties' course of dealing and course of performance, along

with evidence of trade usage, in interpreting the two contracts.  Mass. Gen. Laws ch. 106, § 2-

202(a).  A fact finder could plausibly infer from evidence regarding CQ and Rochem's efforts to

obtain micronized Clozapine for Ivax that, in the Clozapine-importation trade, non-micronized

Clozapine and micronized Clozapine are considered different products, with micronized

Clozapine being more desirable.  See Mass. Gen. Laws ch. 106, § 1-205(2) (defining "usage of

trade"); see also Revised Decl. Joan Chen ¶¶ 24-32 (describing CQ's efforts to obtain

micronized Clozapine for Ivax); E-mail from Dennis Berry, Vice President of Pharmaceutical

Business Development, Rochem, to Charles Dods, Matthew Thiel, & Robyn Frisch (May 11,

2007) [hereinafter "Price Email"], Ex. 4 to Supplemental Decl. Herbert Cohen (document #119)

(discussing the prospect of charging a higher price for micronized Clozapine).[8]  CQ has also

presented evidence, which could potentially fit under the umbrella of "course of dealing" or

"course of performance," that (1) Huizhou Predecessor lacked the capacity to manufacture

micronized Clozapine when it contracted with CQ; (2) the Huizhou companies never acquired or

developed the equipment and facilities necessary to micronize; (3) CQ only purchased non-

micronized Clozapine from the Huizhou companies; and (4) CQ only contracted with SJ and YH

after Ivax requested micronized Clozapine, which CQ knew the Huizhou companies could not

produce.  See Mass. Gen. Laws ch. 106, § 1-205(1) (defining "course of dealing"); id. § 2-208(1)

(discussing "course of performance").  Finally, CQ notes that both the CQ-Huizhou Contract and

the CQ-SJ-YH Contract only contain one price term.  According to CQ, this fact demonstrates

that the contracts do not cover both micronized and non-micronized Clozapine since micronized

Clozapine is more desirable and thus fetches a higher price.  (See Price Email; CQ-Huizhou

Contract ¶ 5; CQ-SJ-YH Contract ¶ 8.)

---

[8] Although CQ did not submit Dennis Berry's May 11, 2007 email until January 2010, well after it filed its
opposition to Rochem's motion for summary judgment, the Court will consider the email since it was sent by a
Rochem employee and thus Rochem should not suffer any prejudice from its late insertion into the summary-
judgment record.  Since the Court finds in Rochem's favor even if it considers the evidence, it will also ignore CQ's
failure to provide Rochem with notice of its intent to provide evidence of usage of trade, as required by Mass. Gen.
Laws ch. 106, § 1-205(6).

These pieces of evidence are not sufficient to create a genuine issue as to the meaning of the term "Clozapine" in the two contracts.  See Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev., 768 F.2d 5, 7-8 (1st Cir. 1985) (discussing how a court ruling on a motion for summary judgment should address a dispute over the "factual meaning" of the terms of a contract).  This is not a case like Sunbury Textile Mills, Inc. v. Commissioner, 585 F.2d 1190, 1196 (3d Cir. 1978), where the parties to a contract agreed as to the meaning of an ambiguous contractual term.  Here, the only evidence that the Huizhou companies understood their contract with CQ to cover solely non-micronized Clozapine is the fact that the Huizhou companies lacked the capacity to manufacture micronized Clozapine and were unwilling to make the investments necessary to gain a micronizing capability.  These facts, however, hardly show that Huizhou Predecessor intended its contract with CQ to bar CQ from purchasing only non-micronized Clozapine from other foreign manufacturers.  If, as CQ claims, there is less of a market for non-micronized Clozapine than there is for the micronized version, one can readily imagine why Huizhou Predecessor might have insisted that CQ refrain from purchasing the superior substitute product from other Chinese manufacturers.  By limiting CQ's supply of Clozapine to the non-micronized version that it could provide, Huizhou Predecessor could incentivize CQ to market its product more aggressively, thereby increasing sales.  If CQ wanted its contract with the Huizhou companies to cover only non-micronized Clozapine, it should have negotiated for a contract that expressly included this limitation. CQ also has presented insufficient evidence to support a finding that the CQ-SJ-YH contract is limited to micronized Clozapine.  Without the supplemental declarations of Chen Hongyi and Joan Chen, CQ has no

evidence that SJ and YH's corporate executives intended their contract with CQ to cover only micronized Clozapine.

However, even if the Court were to consider these declarations, CQ's evidence would still be insufficient to send this case to a jury. Although Chen Hongyi's declaration demonstrates that there may be a genuine issue as to whether SJ intended its contract with CQ to apply to only micronized Clozapine, CQ has presented no admissible evidence that YH's president, Huang Xuan, shared this understanding of the contract's limited scope. CQ has not filed a declaration from Xuan setting forth his understanding of the contract's terms. Instead, in her supplemental declaration, Joan Chen simply asserts, "Huang Xuan always understood that the underlying basis and intent . . . of the [CQ-SJ-YH Contract] was [that] CQ would continue purchasing nonmicronized Clozapine from Huizhou Successor." (Supplemental Decl. Joan Chen ¶ 15; <u>see also</u> <u>id.</u> ¶ 10 ("It was always the intent of the parties that the scope of the contract concerned only the sale of micronized Clozapine and not nonmicronized Clozapine . . . ."); <u>id.</u> ¶ 15 ("Huang Xuan . . . knew that CQ was arranging to purchase nonmicronized Clozapine from Huizhou Successor in May 2005 and Huang Xuan never opposed or objected to CQ's said purchase from Huizhou Successor as same was not in violation of the [CQ-SJ-YH Contract].").) Chen does not explain how she is familiar with Xuan's understanding of the scope of the CQ-SJ-YH Contract. Since Federal Rule of Civil Procedure 56(e)(1) requires that affidavits "be made on personal knowledge," and since Chen does not describe how she has such knowledge of Xuan's thoughts and intentions, the Court would not credit her statements even if it were to overlook the tardy filing of the supplemental declaration. In the absence of evidence that *both* SJ and YH's corporate leaders understood the term "Clozapine" in their contract with CQ to refer to only

"micronized Clozapine," the Court concludes that a reasonable jury could only find that the contract means what its terms say -- the contract embraces all forms of Clozapine, whether micronized or not.

In sum, CQ's argument that the term "Clozapine" means "non-micronized Clozapine" in the CQ-Huizhou Contract and "micronized Clozapine" in the CQ-SJ-YH Contract "places a strain on the word . . . greater than it can bear." Robert Indus., Inc. v. Spence, 291 N.E.2d 407, 410 (Mass. 1973). A reasonable jury could not find based on the shreds of evidence mustered by CQ that all of the parties to the two contracts shared such a highly idiosyncratic understanding of the contracts' limited scope.

The Court could end its analysis here. Since CQ breached its contract with Huizhou Successor by entering into an inconsistent distribution agreement with SJ and YH before Rochem made its challenged purchases, Rochem is entitled to summary judgment. Nevertheless, the Court also notes that Huizhou Successor cannot prove that it was harmed by Rochem's conduct. CQ claims that "Rochem usurped [its] position to become the distributor of Huizhou Successor's Clozapine to Ivax." (Pl.'s Surreply Br. 19, document #108.) But CQ could not have purchased Clozapine from Huizhou Successor without breaching its contract with SJ and YH. CQ cites no authority, and the Court does not know of any, that would permit a plaintiff to recover for tortious interference with contract when the plaintiff would have been required to engage in its own breach of contract to exploit the business relationship with which the defendant allegedly interfered. Absent clear precedent to the contrary, the Court will not presume that the Massachusetts courts would afford CQ a tort remedy to protect its "interest" in maintaining the option to breach its contract with SJ and YH in the event that a deal with

Huizhou Successor appeared more lucrative.  See Andrew Robinson Int'l, Inc. v. Hartford Fire

Ins. Co., 547 F.3d 48, 52 (1st Cir. 2008) (stating that when a district court sitting in diversity

addresses an issue as to which the highest court of the state whose law applies has not spoken,

the federal court "must make an informed prophecy as to the state court's likely stance"); cf.

Restatement (Second) of Torts § 767(c) & cmt. e (noting that the nature of the interest interfered

with should be considered in judging whether the defendant's conduct was improper in a suit

alleging intentional interference with contract); id. § 774 (providing that interference with an

agreement that is illegal or that violates public policy cannot give rise to liability).

   **C.**  **The Court will not impose sanctions on either party.**

   Rochem has requested the Court to impose sanctions on CQ and its attorneys under

Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927.  Rule 11(b) provides that an attorney

or unrepresented party who presents a pleading or written motion to a court

> certifies that to the best of the person's knowledge, information, and belief,
> formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause
> unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law
> or by a nonfrivolous argument for extending, modifying, or reversing existing law
> or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so
> identified, will likely have evidentiary support after a reasonable opportunity for
> further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if
> specifically so identified, are reasonably based on belief or a lack of information.

A court may impose sanctions for violations of Rule 11(b).  Fed. R. Civ. P. 11(c).

28 U.S.C. § 1927 authorizes the Court to sanction an attorney who "multiplies the proceedings in any case unreasonably and vexatiously."  To impose sanctions under section 1927, the Court must find that an attorney has displayed a "serious and studied disregard for the orderly process of justice."  Rossello-Gonzalez v. Acevedo-Vila, 483 F.3d 1, 7 (1st Cir. 2007) (quoting United States v. Nesglo, Inc., 744 F.2d 887, 891 (1st Cir. 1984)).

CQ notes that Rochem's filing of a motion for sanctions "is itself subject to the requirements of [Rule 11] and can lead to sanctions."  Fed. R. Civ. P. 11 Advisory Committee Notes to 1993 Amendments; see also Fed. R. Civ. P. 11(c)(2) ("If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.").  CQ thus asks the Court to punish Rochem for frivolously seeking sanctions and for engaging in other allegedly improper conduct during the course of this highly contentious litigation.

The Court denies each side's request for sanctions.  The thrust of Rochem's sanctions motion is that CQ improperly filed its lawsuit without an adequate investigation and then persisted in litigating its claims after evidence produced in discovery made it clear that they were untenable.  The Court, however, concludes that CQ's claims, although belatedly and insufficiently developed, were not frivolous; thus, CQ should not be sanctioned for pursuing them.  See Silva v. Witschen, 19 F.3d 725, 730-31 (1st Cir. 1994) (noting that the granting of summary judgment does not preordain the imposition of sanctions).

The Court also concludes that CQ's attorneys should not be sanctioned under section 1927 because they have not multiplied these proceedings in a manner that is "unreasonable and harassing or annoying."  Rossello-Gonzalez, 483 F.3d at 7 (quoting Cruz v. Savage, 896 F.2d

626, 632 (1st Cir. 1990)).  The Court does not view the conduct of CQ's attorneys as being

unreasonable or vexatious in light of the history of this case.  Both sides in this highly

contentious litigation have filed numerous motions, oppositions, declarations, and other papers

with this Court in their effort to vigorously represent their clients' interests.

To the extent that Rochem seeks sanctions for CQ's attorneys' decision to notify the

Court of Rochem's attorneys' letter demanding payment of $444,444.44 to settle this litigation,

the Court concludes that this request is wholly meritless.  Although the Court has no desire to

referee the parties' settlement discussions, it is nonetheless troubled by the letter sent by

Rochem's attorneys.  It is utterly implausible that this repeated use of the number "4" occurred

by happenstance; the odds of these numbers being chosen at random are literally one in one-

hundred million.[9]  Although the Court has a hard time believing that Rochem's "settlement

offer" could reasonably be viewed as a "threat," (Letter from Herbert Cohen, Attorney for CQ

(Oct. 23, 2009)), it does appear that the repeated use of the number "4" was the equivalent of an

obscene word or gesture directed at CQ and its attorneys.  Making such an offer reflects poorly

both on Rochem and the lawyers representing it.  While one might expect the plaintiff and its

attorneys to have thicker skin, the Court cannot blame them for bringing this lamentable conduct

to its attention.

---

[9] This assumes that each integer selected in the figure "444,444.44" is independent of the others -- i.e., the
selection of one particular integer in the figure does not affect the probability that another particular integer will be
chosen.  See Richard D. De Veaux et al., Stats: Data and Models 286 (2005) (noting that the probability of multiple
independent events occurring is the product of the probabilities of the individual events occurring); see also id. at
300-01 (defining the concept of "independence").

Aside from this mild rebuke, the Court will not impose any sanctions on the defendant or its counsel. Although the Court has decided not to impose sanctions on CQ, Rochem's request that the Court do so was not frivolous.

## IV.      CONCLUSION

CQ has not come forth with sufficient evidence for a reasonable jury to conclude that Huizhou Successor was contractually obligated not to deal with Rochem in April 2006. It also has not shown how it was harmed by Rochem's conduct since it was bound by its contract with SJ and YH not to purchase Clozapine from Huizhou Successor at the time that Rochem made its purchases. As a result, the Court **GRANTS** Rochem's Motion for Summary Judgment (**document #66**). It also **GRANTS** Rochem's Motion for Discovery Sanctions (**document #51**) and Motion to Strike (**document #94**) insofar as these motions request that the Court disregard the Supplemental Declaration of Chen Hongyi filed on January 19, 2010 (**document #118**).[10] It **DENIES** the balance of these motions as moot in light of the Court's granting of Rochem's motion for summary judgment. Finally, the Court **DENIES** Rochem's Motion for Sanctions (**document #121**) and also **DENIES** CQ's request that the Court impose sanctions on Rochem. **SO ORDERED.**

Date:  **June 7, 2010**                    _/s/ Nancy Gertner_
                                              **NANCY GERTNER, U.S.D.C.**

---

[10] Although not specifically requested by Rochem on this grounds, the Court also strikes Joan Chen's supplemental declaration (**document #120**) because it was not submitted in a timely manner in accordance with Federal Rule of Civil Procedure 56 and the District of Massachusetts's Local Rules. The Court notes, however, that even if it had not stricken Joan Chen's supplemental declaration, its decision on Rochem's motion for summary judgment would have been the same. Even with the supplemental declaration, CQ cannot demonstrate that there is a genuine issue as to whether (1) it breached its contract with Huizhou Successor before Rochem made its purchases, and (2) it was harmed by Rochem's conduct.